1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   SEER SYSTEMS, INC.,                          No. C 03-04636 JSW

10              Plaintiff,

11                                               **CLAIMS CONSTRUCTION
    v.                                           ORDER**

12  BEATNIK, INC., and MICROSOFT CORP.,

13              Defendants.

14  _____/

15       A claim construction hearing to construe the disputed terms of U.S. Patent No.

16  5,886,274 (the '274 Patent) pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370

17  (1996), was held on December 7, 2004 before this Court.  Having carefully reviewed the parties'

18  papers, heard the parties' arguments and considered the relevant legal authority, and good cause

19  appearing, the Court will now construe the disputed claim terms within the patent.[1]

20                            **BACKGROUND**

21       Plaintiff Seer Systems, Inc. ("Seer Systems") seeks to prevent Defendant Microsoft Inc.

22  ("Microsoft") from infringing Seer Systems' patent.  The '274 Patent relates to a system and

23  method for generating, distributing, storing and performing musical work files.  (*See* '274 Patent

24  at 1:7-10.)

25       At the hearing, the parties agreed on constructions for the phrases "musical work file"

26  and "work certifier."  They agreed that "musical work file" may be construed as "file containing

27

28

---

[1] On July 18, 2005, Microsoft filed a miscellaneous administrative request for leave
to file a statement of recent decision and supplemental brief.  The Court HEREBY DENIES
Microsoft's request.

*United States District Court*

*For the Northern District of California*

1  musical data," and that "work certifier" may be construed as "work certifier, which is software."

2  The parties also informed the Court at the hearing that they both agreed to the construction Seer

3  Systems proposed in its reply brief for the term "input device," and thus were no longer seeking

4  the Court's construction of this term.  Accordingly, the Court will not construe these terms.

**ANALYSIS**

6  **A.    Legal Standard.**

7       "It is a bedrock principle of patent law that the claims of a patent define the invention to

8  which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc. v. Safari Water*

9  *Filtration Sys.*, *Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  The interpretation of the scope and

10  meaning of disputed terms in patent claims is a question of law and exclusively within the

11  province of the court to decide.  *Markman v. Westview Instruments*, *Inc.*, 517 U.S. 370, 372

12  (1996).  The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure*

13  *Water*, *Inc.*, 381 F.3d at 1116.  As a result, a court undertaking the construction of disputed

14  terms "looks to sources available to the public that show what a person of skill in the art would

15  have understood the disputed claim language to mean." *Id*.  In most cases, the court's analysis

16  will focus on three sources: the claims, the specification, and the prosecution history.  *Markman*

17  *v. Westview Instruments*, *Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370,

18  372 (1996).  However, on occasion, reliance on extrinsic evidence regarding the relevant

19  scientific principles, the meaning of technical terms, and the state of the art at the time at the

20  time the patent issued is appropriate.

21       The starting point of the claim construction analysis is an examination of the specific

22  claim language.  "[T]he analytical focus must begin and remain centered on the language of the

23  claims themselves, for it is that language that the patentee chose to use to particularly point out

24  and distinctly claim the subject matter which the patentee regards as his invention."

25  *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted).  Indeed, in the

26  absence of an express intent to impart a novel meaning to a term, an inventor's chosen language

27  is given its ordinary meaning.  *York Prods.*, *Inc. v. Cent. Tractor Farm & Family Center*, 99

28  F.3d 1568, 1572 (Fed. Cir. 1996); *see also Invitrogen Corp.* v. *Biocrest Mfg.*, *L.P.*, 327 F.3d

United States District Court

For the Northern District of California

2

1   1364, 1367 (Fed. Cir. 2003) ("Claim language generally carries the ordinary meaning of the

2   words in their normal usage in the field of invention.").  The terms used within a claim bear "a

3   'heavy presumption' that they mean what they say and have the ordinary meaning that would be

4   attributed to those words by persons skilled in the relevant art." *Texas Digital Sys.*, *Inc. v.*

5   *Telegenix*, *Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002); *see also Renishaw PLC v. Marposs*

6   *Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed Cir. 1998) (recognizing that "the claims define

7   the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all

8   cases with the actual words of the claim").  The court's final construction, therefore, must

9   accord with the words chosen by the patentee to mete out the boundaries of claimed invention.

10      The court should also look to intrinsic evidence, including the written description, the

11  drawings, and the prosecution history, if included in the record, to provide context and

12  clarification regarding the intended meaning of the claim terms.  *Teleflex*, *Inc. v. Ficosa N. Am.*

13  *Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002).  The claims do not stand alone, rather, "they

14  are part of 'a fully integrated written instrument.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.

15  Cir. 2005) (en banc) (quoting *Markman*, 52 F.2d at 978).  The specification "may act as a sort of

16  dictionary, which explains the invention and may define the terms used in the claims."

17  *Markman*, 52 F.3d at 979-980.  The specification can also indicate whether the patentee

18  intended to limit the scope of a claim, despite the use of seemingly broad claim language.

19  *SciMed Life Sys.*, *Inc. v. Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir.

20  2001) (recognizing that when the specification "makes clear that the invention does not include

21  a particular feature, that feature is deemed to be outside the reach of the claims of the patent,

22  even though the language of the claims, read without reference to the specification, might be

23  considered broad enough to encompass the feature in question").

24      Intent to limit the claims can be demonstrated in a number of ways.  For example, if the

25  patentee "acted as his own lexicographer," and clearly and precisely set forth a definition of the

26  disputed term in either the specification or the prosecution history, the court will defer to that

27  definition.  *CCS Fitness*, *Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  All

28  that is required to so limit the claims is for the patentee to set out the alternative meaning in the

**United States District Court**

For the Northern District of California

United States District Court

For the Northern District of California

1   specification "in a manner sufficient to give one of ordinary skill in the art notice of the change

2   from the ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117.  In addition, the court will

3   adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee

4   distinguished that term from prior art on the basis of a particular embodiment, expressly

5   disclaimed subject matter, or described a particular embodiment as important to the invention."

6   *CCS Fitness, Inc.*, 288 F.3d at 1367.  Likewise, the specification may be used to resolve

7   ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack

8   sufficient clarity to permit the scope of the claim to be ascertained from the words alone."

9   *Teleflex*, 299 F.3d at 1325.

10          However, limitations from the specification (such as from the preferred embodiment)

11  may not be read into the claims, absent the inventor's express intention to the contrary.  *Id*. at

12  1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not describe in the

13  specification every conceivable and possible future embodiment of his invention."); *Virginia

14  Panel Corp. v. MAC Panel Co*., 133 F.3d 860, 866 (Fed. Cir. 1997) ("[I]t is well-settled that

15  device claims are not limited to devices which operate precisely as the embodiments described

16  in detail in the patent.").  To protect against this result, the court's focus should remain on

17  understanding how a person of ordinary skill in the art would understand the claim terms.

18  *Phillips*, 415 F.3d at 1323.

19          If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim

20  language, the court may then turn to extrinsic evidence, such as expert declarations and

21  testimony from the inventors.  *Intel Corp. v. VIA Techs., Inc*., 319 F.3d 1357, 1367 (Fed. Cir.

22  2003) ("When an analysis of intrinsic evidence resolves any ambiguity in a disputed claim term,

23  it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.").  When

24  considering extrinsic evidence, the court should take care not to use it to vary or contradict the

25  claim terms.  Rather, extrinsic evidence is more appropriately relied upon to assist in

26  determining the meaning or scope of technical terms in the claims.  *Vitrionics Corp. v.

27  Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

28

**United States District Court**
For the Northern District of California

1    Dictionaries also may play a role in the determination of the ordinary and customary

2   meaning of a claim term.  The Federal Circuit recently reiterated that "[d]ictionaries or

3   comparable sources are often useful to assist in understanding commonly understood meanings

4   of words . . . ." *Phillips*, 415 F.3d at 1322.  But the *Phillips* court admonished that district

5   courts should be careful not to allow dictionary definitions to supplant the inventor's

6   understanding of the claimed subject matter.  "The main problem with elevating the dictionary

7   to . . . prominence is that it focuses the inquiry on the abstract meaning of the words rather than

8   on the meaning of the claim terms within in the context of the patent."  *Id*. at 1321.

9   Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

10    In addition, the court has the discretion to rely upon prior art, whether or not cited in the

11   specification or the file history, but only when the meaning of the disputed terms cannot be

12   ascertained from a careful reading of the public record.  *Vitronics*, 90 F.3d at 1584.  Referring to

13   prior art may make it unnecessary to rely upon expert testimony, because prior art may be

14   indicative of what those skilled in the art generally understood certain terms to mean.  *Id.*

15   Unlike expert testimony, these sources are accessible to the public prior to litigation to aid in the

16   determination of the scope of an invention.  *Id.*

17   **B.    Claim Construction.**

18       **1.    "Music control signals"**

19    Seer Systems proposes that "music control signals" be construed as: "signs for guiding a

20   musical performance" or as  "signals for controlling a musical performance."  Microsoft

21   proposes the term be construed as: "signals that are used in generating or reproducing sound,

22   such as instrument sound selections, music sequence data, initial topology such as initial mix

23   and effect parameters, or topology changes such as mix and effect parameter changes."

24    At the hearing, the Court proposed the following two constructions: "signals for

25   controlling a musical work," and "signals for controlling the performance of a musical work."

26   Seer Systems was amenable to either of the Court's proposed construction.  Microsoft, on the

27   other hand, argued primarily that this term as it appears in claim 1 covers, but is not limited, to

28   musical pieces.  According to Microsoft, claim 1 covers any sound.

**United States District Court**

For the Northern District of California

1   The Court does not agree that "music" may be read out of "music control signals."

2   Claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d

3   at 1315 (quoting *Markman*, 52 F.3d at 979). Here, the specification makes clear that the patent

4   relates to music. The specification states that the "invention relates generally to Musical

5   Instrument Digital Interface (MIDI) technology, and more particularly to a system and method

6   fo generating, distributing, storing and performing musical work files." (*See* '274 Patent at 1:7-

7   10.) The summary of the invention is "a system and method for composing and playing back

8   musical works." (*See* '274 Patent at 1:53-54.) The specification repeatedly describes how the

9   invention relates to musical works, pieces and compositions. (*See* '274 Patent at 1:7-10, 1:53-

10   2:13, 2:65-3:1, 3:32-38, 3:53-57, 3:66-4:31, 4:59-5:17, 5:56-6:26, 6:41-8:50.) Therefore, read

11   in context of the specification, the Court concludes that "music control signals" is limited to

12   music, as opposed to any sound.

13   Accordingly, the Court construes the term "music control signals" to mean: "**signals for**

14   **controlling a musical work**."

15   **2.      "Work manager"**

16   Seer Systems proposes that "work manager" be construed as: "software for handling a

17   composition." Microsoft proposes the term be construed as: "a piece of software." Both parties

18   agree that the work manager is a piece of software. At the hearing, the Court proposed the

19   following constructions: "software for handling or managing a musical work," or alternatively,

20   "software for managing, including generating or storing, a musical work."

21   The patent specification teaches that the work manager generates musical work files,

22   stores the sound bank to the musical work file, reformats, imports and exports sound bank,

23   sample bank, effect bank and raw musical data into a predetermined file format, maintains the

24   file legitimacy, allows real-time edit buffering and file maintenance. (*See* '274 Patent at 1:58-

25   59, 2:10-11, 4:59-5:1, 5:51-6:4, 7:54-58.) Accordingly, the Court construes the term "work

26   manager" to mean: "**software for managing a musical work**."

27

28

6

United States District Court

For the Northern District of California

3. **"Work link"**

Seer Systems proposes that "work link" be construed as: "a connection to a component of a composition in a separate file or on a network." Microsoft proposes the term be construed as: "a reference to a musical data storage location."

The specification of the patent discloses that the work links reference work link data, or more specifically, reference the location of musical data. (*See* '274 Patent at 4:31-32, 4:35-45, 6:18-19, 6:66-7:2, 7:24-25, 7:37, 8:31-33.) The specification identifies other aspects of the invention which actually retrieve the data from the location referenced from the work link, such as the synthesizer engine. (*See* '274 Patent at 4:36-39.) There is no support in the intrinsic evidence for Seer Systems' proposed definition of a work link as the "connection" to the data. Instead, Seer Systems relies entirely on extrinsic evidence, such as dictionary definitions which describe a "link" as a connection between items. The Federal Circuit recently clarified the role dictionaries and other extrinsic evidence should play in claim construction. *Phillips*, 415 F.3d at 1317-18. Generally, "extrinsic evidence [is] ... less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. at 1318. While "extrinsic evidence may be useful to the court, ... it is unlikely to result in a reliable interpretation of patent claim scope unless it is considered in the context of the intrinsic evidence." *Id*. at 1319. Given the flaws inherent in extrinsic evidence described by the Federal Circuit in *Phillips*, and the lack of support in the intrinsic evidence for a defining work link as a "connection," the Court declines to construe work link in the manner proposed by Seer Systems.

Accordingly, the Court construes the term "work link" to mean: "**reference to musical data**."

4. **"Work link data"**

Seer Systems proposes that "work link data" be construed as: "a component of a composition referenced by a work link." Microsoft proposes the term be construed as: "data stored at the location referenced by the work link."

The specification of the patent discloses that the work link data is musical data, such as "previously created sounds, effects, samples, etc." which is stored in the system in locations

7

referenced by work links.  (*See* '274 Patent at 4:31-34.)  The specification also describes work link data as "instrument sounds."  (*See* '274 Patent at 4:35-38.)  Although it is clear from the specification that work link data is data which is stored in locations referenced by work links, this definition is evident from the claims read as a whole as well.  Construing work link data to include "stored at the location referenced by the work link" as part of its definition would be redundant.  Accordingly, the Court construes the term "work link data" to mean: "**musical data**."

**CONCLUSION**

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms.  The parties are ordered to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 within 21 days of the filing of this Order.

**IT IS SO ORDERED.**

Dated: September 20, 2005

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE