**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEER SYSTEMS, INC., | No. C 03-04636 JSW |
| Plaintiff, | |
| v. | **CLAIMS CONSTRUCTION ORDER RE MEANS-PLUS-FUNCTION CLAIMS** |
| BEATNIK, INC., and MICROSOFT CORP., | |
| Defendants. | |

On March 14, 2006, this Court held a claim construction hearing to construe the disputed means-plus-function terms of U.S. Patent No. 5,886,274 ("the `274 Patent") pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The was the second claim construction hearing in this matter. Having carefully reviewed the parties' papers, heard the parties' arguments and considered the relevant legal authority, and good cause appearing, the Court will now construe the disputed claim terms within the `274 Patent.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Seer Systems, Inc. ("Seer Systems") seeks to prevent Defendant Microsoft Corp. ("Microsoft") from infringing Seer Systems' patent. The `274 Patent relates to a system and method for generating, distributing, storing and performing musical work files. (*See* `274 Patent at 1:7-10.)

At issue are disputed terms in claims 26 and 44. The parties agree that the disputed terms in these claims are means-plus-function claims and agree on the functions for the disputed

1  claims. Therefore, the only issue before the Court is to determine the corresponding structures

2  disclosed in the specification as clearly linked to the linked to these claimed functions.

**ANALYSIS**

**A.  Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc. v. Safari Water Filtration Sys.*, *Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman v. Westview Instruments*, *Inc.*, 517 U.S. 370, 372 (1996). In addition, the determination of whether a claim is written in means-plus-function format and the determination of the claimed function and corresponding structure in the specification of a means-plus-function claim limitation is a question of law. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000).

The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, a court undertaking the construction of disputed terms "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments*, *Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, reliance on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued is appropriate.

The starting point of the claim construction analysis is an examination of the specific claim language. A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee chose to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its

2

ordinary meaning. *York Prods.*, *Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp.* v. *Biocrest Mfg.*, *L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003) ("Claim language generally carries the ordinary meaning of the words in their normal usage in the field of invention."); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). A court's final construction, therefore, must accord with the words chosen by the patentee to mete out the boundaries of the claimed invention.

A court also may look to intrinsic evidence, including the written description, the drawings, and the prosecution history, if included in the record, to provide context and clarification regarding the intended meaning of the claim terms because the claims do not stand alone. *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). Rather, "they are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which explains the invention and may define the terms used in the claims." *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys.*, *Inc. v. Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp. v. VIA Techs.*, *Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is

improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original). When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

A patentee may write a claim in a means-plus-function format pursuant to 35 U.S.C. section 112, paragraph 6, by defining a particular function in the claims and a corresponding structure in the specification. *Kemco Sales*, 208 F.3d at 1360. Section 112, paragraph 6 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure ... in support thereof, and such claim shall be construed to cover the corresponding structure ... described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6 (2000). Construction of means-plus-function claims entails a two-step process. *Medical Instrumentation & Diagnostics Corp. v. Elektra AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). In the first step, the court must identify the particular claimed function. *Id*. In the second step, the court looks to the specification and identifies the structure that corresponds to that function. *Id*. A structure is a "corresponding structure" only if that element is necessary to perform the function recited in the claim and is clearly linked to that function by the disclosure in the specification. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001). The patentee's "duty to clearly link or associate structure to the claimed function" represents the fair exchange for the convenience of employing means-plus-function claim limitations. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001).

In the electronic context, "[a] computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm." *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005). Thus, "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to

perform the disclosed algorithm." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).

An algorithm, broadly defined, is "a step-by-step procedure for solving a problem or accomplishing some end." *In re Iwahashi*, 888 F.2d 1370, 1374 (Fed. Cir. 1989) (quoting Webster's New Collegiate Dictionary (1976)). The Federal Circuit has made clear that "every step-by-step process, be it electronic or chemical or mechanical, involves an algorithm in the broad sense of the term." *Id*. There is "no need for a disclosure of the specific program code" when software is linked to the claimed function and one of ordinary skill in the art would know the kind of program to use. *Medical Instrumentation*, 344 F.3d at 1214; *see also Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) (holding that the "core logic" modified to perform a particular program was adequate corresponding structure for a claimed function although the specification did not disclose the internal circuitry of the core logic).

**B.     Claim Construction.**

### 1.     The Disputed Claim Terms and the Specification Disclose a Specially Programmed Processor.

The parties have raised a threshold issue that affects the construction of both claim 26 and claim 44 of the `274 Patent.  Seer Systems contends, following *WMS Gaming*, that the specification describes a central processing unit ("CPU") specially programmed to perform the disclosed corresponding structure or algorithm.  Microsoft argues that the `274 Patent nowhere states or suggests that a computer, microprocessor, or CPU performs the claimed functions recited in claims 26 and 44.

In *WMS Gaming*, the Federal Circuit held that "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." 184 F.3d at 1349. Although the holding of *WMS Gaming* applies here, its analysis is not exactly on point because in that case, unlike here, the parties stipulated that the patent disclosed a microprocessor to control the operation of the slot machine at issue. *See id.* at 1347.

Rather, the case governing the precise issue here is *Harris*, which interpreted *WMS Gaming*. In *Harris*, the Federal Circuit construed claim 1 of the patent at issue, pertaining to a communication system comprising "time domain processing means." *Harris*, 417 F.3d at 1245-46. The district court had found that the corresponding structure for the "time domain processing means" was a symbol processor disclosed in the patent. *Id.* at 1246. On appeal, the Federal Circuit held that this construction was legally insufficient under *WMS Gaming* because although the patent disclosed that the processor was linked to, and implemented the recited function, the corresponding structure was "a microprocessor programmed to carry out" the algorithm described in the patent. *Id.* at 1253-54.

As in *Harris*, the `274 Patent here describes a "computer-implemented means-plus-function term." *Id.* at 1253. First, with respect to the composition system of claim 26, the specification discloses that "[c]omposition system 240 also may be stored in data storage device 235 and loaded into RAM 210 *for execution by CPU*." (*See* `274 Patent at 3:38-40 (emphasis added).) Microsoft stresses the language in the specification that "[i]t will further be appreciated that since the entire composition system 240 is implemented in software . . ." to demonstrate that the `274 Patent discloses no hardware as corresponding structure for the claimed functions. (*See id.* at 5:18-19.) However, remainder of this sentence belies Microsoft's argument. The sentence concludes: ". . . it is possible to maintain any number of channels and any number of tracks, but, of course, *limited by processor speed*, system bandwith and *memory availability*." (*See id.* at 5:19-22 (emphasis added).) This language in the specification clearly discloses that a CPU is used to implement the disclosed algorithm or software. Therefore, the Court finds that with respect to the composition system, the `274 Patent discloses a CPU programmed to implement an algorithm.

Second, with respect to the player system of claim 44, the specification also describes a CPU programmed to carry out an algorithm. For example, the specification teaches that "[p]layer system 740 may be stored in data storage device 735 and loaded into RAM 710 *for execution by CPU 705*." (*See id.* at 6:45-47 (emphasis added).) Consequently, with respect to

1  the player system as well, the Court finds that the `274 Patent discloses a CPU as part of the
2  corresponding structure.
3    Having concluded that the `274 Patent discloses a CPU, the Court will now construe the
4  disputed claim terms in light of the disclosed algorithms.  *See WMS Gaming*, 184 F.3d at 1349.

   **2.    "Means for receiving music control signals"**

6    Claim 26 of the `274 Patent claims, in pertinent part, "[a] composition system
7  comprising: means for receiving music control signals." (*See* `274 Patent at 10:34-35.) The
8  parties agree that the function is "receiving music control signals."  Seer Systems proposes that
9  the disputed structure be construed as: "A central processing unit programmed to perform the
10  disclosed algorithm of receiving musical control signals through loading them from composer
11  server data storage or RAM after transmission from input device, and equivalents thereof."
12  Microsoft proposes the term be construed as: "This 'means' corresponds to 'synthesizer engine
13  305' in Fig. 3, 'sequencer 325' in Fig. 3, or 'input device' referred to in the Abstract and the
14  Summary of the Invention."  At the hearing, the Court proposed the following construction: "A
15  central processing unit programmed to perform the disclosed algorithm of receiving music
16  control signals from MIDI input device and passing them through a synthesizer engine to the
17  sequencer for storage, and equivalents thereof."
18    The patent specification teaches that "composition system 240 . . . includes synthesizer
19  engine 305 coupled to signal bus 225 for processing input control signals from input device
20  105." (*See* `274 Patent at 3:59-61.) The specification further teaches that composer server 110,
21  which includes composition system 240, "receives input control signals representing sound via a
22  Musical Instrument Digital Interface (MIDI) input device 105." (*See id.* at 3:2-4.) In particular,
23  the specification discloses the following algorithm: "Step 940 includes receiving other input
24  control signals such as intonation and expression information from MIDI input device 105 and
25  passing the signals through synthesizer engine 305 to sequencer 325 for storage." (*See id.* at
26  7:41-45.) Accordingly, the Court construes the corresponding structure of "means for receiving
27  music control signals" to be: "**A central processing unit programmed to perform the**
28

7

**disclosed algorithm of receiving music control signals from MIDI input device and passing them through a synthesizer engine to the sequencer for storage, and equivalents thereof.**"

### 3. "Means for receiving at least a portion of a sound bank containing at least one instrument sound"

Claim 26 of the `274 Patent claims, in relevant part, "[a] composition system comprising: . . . means for receiving at least a portion of a sound bank containing at least one instrument sound." (*See* `274 Patent at 10:34-37.) The parties agree that the claimed function is "receiving at least a portion of a sound bank containing at least one instrument sound."

Seer Systems proposes that the disputed structure be construed as: "A central processing unit programmed to perform the disclosed algorithm of receiving at least a portion of a sound bank containing at least one instrument sound through loading it from local sound bank and, if there are work links, downloading it from locations specified in computer network, and equivalents thereof." Microsoft proposes the term be construed as: "This 'means' corresponds to 'synthesizer engine 305' in Fig. 3 or 'work manager 345' in Fig. 3." At the hearing, the Court proposed the following construction: "A central processing unit programmed to perform the disclosed algorithm of receiving at least a portion of a sound bank containing at least one instrument sound through retrieving composer-selected instrument sounds either from local sound bank or, if there are work links, from locations in music network system, and equivalents thereof."

The composition system includes a synthesizer engine coupled to a signal bus for processing control signals from an input device, including instrument sound selections. (*See* `274 Patent at 3:58-62.) The specification teaches that "to incorporate instrument sounds, synthesizer engine 305 retrieves the composer-selected instrument sounds either from local sound bank 250 or from the locations in system 100 referenced by work links." (*See id.* at 4:35-39.) Similarly, "to incorporate samples, the synthesizer engine 305 retrieves the samples either from the local sound bank 252 or from the locations in system 100 referenced by work links." (*See id.* at 4:39-42.) Moreover, the specification discloses the corresponding structure through the algorithm of "selecting one of the sounds from sound bank 250, or selecting a previously

8

created sound from a location somewhere within network 120 and adding a work link 630 to reference that location." (*See id*. at 7:21-25.) Accordingly, the Court construes the corresponding structure of "means for receiving at least a portion of a sound bank containing at least one instrument sound" to be: "**A central processing unit programmed to perform the disclosed algorithm of receiving at least a portion of a sound bank containing at least one instrument sound through retrieving composer-selected instrument sounds either from local sound bank or, if there are work links, from locations in music network system, and equivalents thereof**."

    4.    **"Means for storing the music control signals and received sound bank portion as a musical work file"**

Claim 26 of the `274 Patent claims, in pertinent part, "[a] composition system comprising: . . . means for storing the music control signals and received sound bank portions as a musical work file." (*See* `274 Patent at 10:34-39.) The parties agree that the claimed function is "storing the music control signals and received sound bank portion as a musical work file."

Seer Systems proposes that the disputed structure be construed as: "A central processing unit programmed to perform the disclosed algorithm of storing the music control signals and received sound bank portion through assigning and storing header data to file, computing and storing initialization data to file, retrieving, reformatting and storing music control signals and received sound bank portion to file, and certifying file, and equivalents thereof." Microsoft proposes the following construction: "This 'means' corresponds to 'work manager' in the Abstract and the Summary of the Invention." At the hearing, the Court proposed the following construction: "A central processing unit programmed to perform the disclosed algorithm of storing the music control signals and received sound bank portion through a work manager that assigns musical work file header data, computes initialization data, reformats, imports and exports raw musical data, stores all such data into a musical work file and certifies said musical work file, and equivalents thereof."

The claimed composition system contains programs for generating an integral music work file, later forwarded to the player client. (*See* `274 Patent at 3:32-38.) The specification

9

teaches that "[h]eader utilities engine 505 assigns and stores in musical work file 255 header data including musical work file identification (ID) information . . . [and] may also compute and store in musical work file 255 the number of channels needed . . . to perform the musical work." (*See id*. at 5:56-63.)  Similarly, "[d]ata I/O engine 510 retrieves, reformats and stores sound bank 250, sample bank 252, effect bank 254 and raw musical data 330 into musical work file 255" and may also "use resource data 513 to compute and store initialization data . . . ." (*See id*. at 5:64-67, 6:1.)  The `274 Patent further discloses that this algorithm ends when the work certifier certifies the musical work file so that the player client can authenticate it and verify its performance rights.  (*See id*. at 7:59-67, 8-1-11; *see also* Figs. 6, 9, 10.)  Consequently, the Court construes the corresponding structure of "means for storing the music control signals and received sound bank portions as a musical work file" to be: "**A central processing unit programmed to perform the disclosed algorithm of storing the music control signals and received sound bank portion through a work manager that assigns musical work file header data, computes initialization data, reformats, imports and exports raw musical data, stores all such data into a musical work file and certifies said musical work file, and equivalents thereof**."

     **5.**    **"Means for receiving a musical work file containing downloadable-in-real-time topology information, downloadable-in-real-time music sequence data, and a sound bank which includes at least one downloadable-in-real-time instrument sound"**

Claim 44 of the `274 Patent claims, in relevant portion, "[a] player system that can receive and play downloadable-in-real-time musical data, comprising: means for receiving a musical work file containing downloadable-in-real-time topology information, downloadable-in-real-time music sequence data, and a sound bank which includes at least one downloadable-in-real-time instrument sound." (*See* `274 Patent at 12:12-18.)  The parties agree that the claimed function is "receiving a musical work file containing downloadable-in-real-time topology information, downloadable-in-real-time music sequence data, and a sound bank which includes at least one downloadable-in-real-time instrument sound."

Seer Systems proposes that the disputed structure be construed as: "A central processing unit programmed to perform the disclosed algorithm of receiving a musical work file through loading from player client data storage device or RAM after its transmission from network communications interface or CD Drive and accessing it to authenticate file and verifying playback rights, and equivalents thereof." Microsoft proposes the term be construed as: "This 'means' corresponds to 'certifier 805' in Fig. 8." At the hearing, the Court proposed the following construction: "A central processing unit programmed to perform the disclosed algorithm of receiving a musical work file through downloading musical work file from composer server via communications interface or CD drive, and examining certification of said musical work file to authenticate and to determine performance rights, and equivalents thereof."

Figure 7 of the `274 Patent shows that the player system 740 is part of the player client 125. (*See* `274 Patent, Fig. 7.) "Player client 125 may receive the control signals and other data from composer server 110 via computer network 120 or via a compact disk (CD) 135 . . . ." (*See id*. at 3:6-8.) Further, the specification discloses the following algorithm: "method 1100 for performing a channel of musical work file 255 . . . begins with step 1105 by communications interface 730 or CD drive 720 of player client 125 receiving musical work file 255. Certifier 805 in step 1110 examines certification 640 to determine whether player client 125 is certified to perform the musical work file 255." (*See id*. at 8:12-18.) If the player client is certified, the specification teaches that the certifier forwards at least a portion of a first channel contained in the musical work file to the sequencer, which forwards the corresponding channel portion to the synthesizer engine. (*See id*. at 8:19-22.)

In addition, relevant excerpts from the prosecution history support the Court's proposed construction. The prosecution history states that "data from storage device 235 is 'downloadable' through network 120 to player system 740. Further, data in storage device 235 can be represented by work links 630, which is downloadable 'in real time' (page 15, lines 12-15). ... Music sequence data (FIG. 6, item 615), part of downloadable-in-real-time raw musical data 330 (FIG. 6), is [also] downloadable in real time." (Declaration of Dr. Curtis Roads in

11

Support of Seer Systems, Inc.'s Opening Claim Construction Brief ("Roads Decl."), Ex. B at P 0013 (citation in original).)

Accordingly, the Court construes the corresponding structure of "means for receiving a musical work file containing downloadable-in-real-time topology information, downloadable-in-real-time music sequence data, and a sound bank which includes at least one downloadable-in real-time instrument sound" to be: "**A central processing unit programmed to perform the disclosed algorithm of receiving a musical work file through downloading musical work file from composer server via communications interface or CD drive, and examining certification of said musical work file to authenticate and to determine performance rights, and equivalents thereof**."

### 6. "Means for processing the music sequence data based on the topology information and the sound bank"

Claim 44 of the `274 Patent claims, in pertinent part, "[a] player system that can receive and play downloadable-in-real-time musical data, comprising: . . . means for processing the music sequence data based on the topology information and the sound bank." (*See* `274 Patent at 12:12-20.) The parties agree that the claimed function is "processing the music sequence data based on the topology information and the sound bank."

Seer Systems proposes that the disputed structure be construed as: "A central processing unit programmed to perform the disclosed algorithm of processing the music sequence data through playing the raw musical data, loading sounds from sound bank in the musical work file, loading work linked sounds by downloading them in real time from composer server or computer network and mixing the music sequence and effects, and equivalents thereof." Microsoft proposes the term be construed as: "This 'means' corresponds to 'sequencer 810' in Fig. 8, 'synthesizer engine 815' in Fig. 8, 'mixer 820' in Fig. 8, 'reverb 825' in Fig. 8, and 'chorus 830' in Fig. 8." At the hearing, the Court proposed the following construction: "A central processing unit programmed to perform the disclosed algorithm of processing the music sequence data through: (1) playing the raw musical data; (2) downloading in real time from the composer server or computer network the composer-selected initial mix and effect parameters;

12

1  (3) retrieving from sound bank the instrument sounds referenced by the music sequence, and
2  from locations specified by work links any instruments, mixes, effects or other work link data;
3  and (4) determining availability of all sounds needed to perform musical work, and equivalents
4  thereof."

5  The specification teaches that after certification of the music work file, for the first
channel portion, "synthesizer engine 815 in step 1120 downloads the composer-selected initial
mix parameters from raw musical data 330 of musical work file 255 to mixer 820, and in step
1125 downloads the composer-selected initial effect parameters 620" from the raw musical data
of the musical work file to the selected effects. (*See* `274 Patent at 8:23-29.) The synthesizer
then "retrieves from sound bank 250 the instrument sounds referenced by the music sequence
615, and . . . downloads any instruments, mixes, effects or other work link data from the
locations specified by work links 630." (*See id.* at 8:29-33; *see also* Figs. 1, 6, 7, 8, 11.) In the
next step of the disclosed algorithm, the synthesizer engine determines the availability of all
sounds needed to perform the musical work. (*See id.* at 8:34-35.) If all needed sounds are
available, then the next step is to convert the channel portion to sound. (*See id.* at 8:36; 44-51.)
If, however, "a custom sound is unavailable, synthesizer engine 1136 determines whether a fall-
back sound . . . is available to replace it." (`274 Patent at 8:36-39.)

Moreover, the prosecution history reveals that "[t]opology information, sequence data,
and a sound bank contained in a musical work file of the claimed invention are also
downloadable in real time. Topology information . . . is downloadable . . . '*during performance
of the musical work*' (page 14, lines 14-18, emphasis added), which is 'real time.'" (Roads
Decl., Ex. B at P 0013 (emphasis and citations in original).) Music sequence data and work
links are also downloadable in real time. (*Id.*) These statements in the prosecution history
further support the Court's proposed construction.

As a result, the Court construes the corresponding structure of "means for processing the
music sequence data based on the topology information and the sound bank" to be: "**A central
processing unit programmed to perform the disclosed algorithm of processing the music
sequence data through: (1) playing the raw musical data; (2) downloading in real time**

1  **from the composer server or computer network the composer-selected initial mix and**
2  **effect parameters; (3) retrieving from sound bank the instrument sounds referenced by**
3  **the music sequence, and from locations specified by work links any instruments, mixes,**
4  **effects or other work link data; and (4) determining availability of all sounds needed to**
5  **perform musical work, and equivalents thereof**."

6         **7.**         **"Means for converting the processed music sequence data to sound"**

7         Claim 44 of the `274 Patent claims, in relevant part, "[a] player system that can receive
8 and play downloadable-in-real-time musical data, comprising: . . . means for converting the
9 processed music sequence data to sound." (*See* `274 Patent at 12:12-22.) The parties agree that
10 the claimed function is "converting the processed music sequence data to sound."

11         Seer Systems proposes that the disputed structure be construed as: "A central processing
12 unit programmed to perform the disclosed algorithm of converting the processed music
13 sequence data to sound through controlling speaker system, and equivalents thereof." Microsoft
14 proposes that the term be construed as: "This 'means' corresponds to 'client sound output
15 device 130' and 'synthesizer driver 745' in Fig. 8." At the hearing, the Court proposed the
16 following construction: "A central processing unit programmed to perform the disclosed
17 algorithm of converting the processed music sequence data to sound by the synthesizer driver, in
18 conjunction with the client sound output device, or by the speaker system coupled to the mixer,
19 and equivalents thereof."

20         The specification discloses the following algorithm: "[i]n step 1140, synthesizer engine
21 815 synthesizes and forwards the corresponding channel portion to synthesizer driver 745,
22 which in conjunction with client sound output device 130 (FIG. 1) converts the synthesized
23 channel portion to sound." (*See* `274 Patent at 8:44-47.) In the next step, the sequencer
24 determines whether the musical work file includes another channel portion to be performed.
25 (*See id.* at 8:48-50.) The specification also teaches that the player client, which includes the
26 player system, "uses a client sound output device 130 to convert the control signals and other
27 data to sound." (*See id.* at 3:6-10.) Moreover, both the Abstract and the Summary of the
28

14

Invention refer to "a speaker system coupled to the mixer for converting the mixed music control signals to sound." (*See id*. at 1:66-67; Abstract.)

At the hearing, Microsoft argued that "the speaker system coupled to the mixer" does not appear in the specification. However, as discussed above both the Abstract and the Summary of the Invention disclose this corresponding structure. (*See id*. at 1:66-67; Abstract.) The Abstract and Summary of the Invention are part of the specification. Thus, the Court must consider these sections in construing the disputed means-plus-function terms. *See Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356-57 (Fed. Cir. 1999); *see also* 35 U.S.C. § 112, ¶ 6. Therefore, Microsoft's argument is unfounded.

Accordingly, the Court construes the corresponding structure of "means for converting the processed music sequence data to sound" to be: "**A central processing unit programmed to perform the disclosed algorithm of converting the processed music sequence data to sound by the synthesizer driver, in conjunction with the client sound output device, or by the speaker system coupled to the mixer, and equivalents thereof**."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed means-plus-function terms. Pursuant to Patent Standing Order ¶ 13, the parties are ordered to submit a further joint case management report within twenty-one days of the filing of this Order.

**IT IS SO ORDERED.**

Dated: March 22, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE